IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| APX ALARM SECURITY SOLUTIONS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> RENAISSANCE MARKETING, INC., d/b/a ALARMEX, <br><br> Defendant. | CIVIL NO. 06-1776 <br><br><br><br> FINAL JUDGMENT RE: TORTIOUS INTERFERENCE AND COMMERCIAL DEFAMATION CLAIMS |

## OPINION AND ORDER

For the reasons set forth herein, the relief requested by Plaintiff APX Alarm Security Solutions, Inc., hereinafter referred to as "APX", in its Complaint against Defendant for contractual tortious interference and commercial defamation is granted.

The default of defendant was entered by the court after Renaissance Marketing, Inc. d.b.a. Alarmex, hereinafter referred to as "Alarmex," refused to timely appear after counsel resigned and duly notified "Alarmex." Docket No. 161 (Civil No. 06-1610). All notices sent by the court after counsel resigned have been returned unclaimed.

The default (damages) hearing under Fed. R. Civ. P. 55(b)(2) was held on September 4, 2009, Docket No. 47, Minutes. Plaintiff, APX Alarm Security Solutions Inc., presented the testimony of Nathan Wilcox, its general counsel, who quantified the amount of damages. The court also considered the testimony of Jorge Javier Marrero, provided during the injunction hearing held in August 3 and 23, 2007, which established

1

the number of Plaintiff's customers lost as a result of Defendant's tortious conduct. Defendant did not appear at the hearing notwithstanding the notices provided. The Court also took judicial notice of the applicable local interest rate, established periodically pursuant to law by a state government entity, to determine pre-judgment and post-judgment interest. Finally, Plaintiff introduced into evidence the templates of two contracts used in Puerto Rico with Plaintiff's customers during 2006 and 2007. All the evidence offered was admitted.

Once the default was entered in favor of APX, Defendant had no further standing to contest the factual allegations of APX's claims for relief. Defendant's liability was deemed established insofar as Defendant is deemed to have admitted all well pleaded allegations in the Complaint in this matter. Having defaulted, Defendant could only question the extent of the damages APX suffered. See Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit International Inc., 982 F.2d 686 (1st Cir. 1993); Metropolitan Life Insurance Company v. Colon Rivera, 204 F. Supp 2d 273 (D.C.P.R. 2002); Caribbean Produce Exchange v. Caribe Hydro Trailer, Inc., 65 F.R.D. 46 (D.C.P.R. 1974); Thompson v. Wooster, 114 U.S. 104, 110 (1984) (a default constitutes an acceptance by the party constituting a "confession of the action" accepting all well plead facts of the complaint).

**A. FINDINGS OF FACT**

This Court has ruled that Defendant in this case is in default (see Docket No. 47) and makes the following findings of fact:

Plaintiff is a corporation which was incorporated under the laws of and by the state of Utah, in good standing with the state of Utah, and has its principal place of

business ("nerve center") in the state of Utah. Plaintiff is licensed to sell home security systems in various states and installs home security systems door-to-door throughout the United States and in the Commonwealth of Puerto Rico.

Renaissance Marketing, Inc. dba Alarmex ("Defendant") is a corporation which was incorporated under the laws of and by the Commonwealth of Puerto Rico, sells home security systems in Commonwealth of Puerto Rico, and has its principal place of business in the Commonwealth of Puerto Rico.

Each year, Plaintiff enters into contracts with sales representatives, mostly hired in Utah, who then engage in door-to-door sales of home security systems throughout the United States and Puerto Rico for Plaintiff.

To compensate for its inability to achieve the same sales volume as Plaintiff, and to avoid the simple hard work of a door-to-door sales campaign, Defendant, Alarmex, and its sales representatives devised a scheme to unjustly enrich themselves at Plaintiff's expense by interfering with Plaintiff's contracts with its customers and poaching Plaintiff's customers.

In furtherance of this scheme, Defendant began "shadowing" Plaintiff's sales representatives as they would leave to begin selling to determine the neighborhoods and areas in which Plaintiff sales representatives were operating.

After Plaintiff sales representatives completed a successful door-to-door sales campaign in these neighborhoods, Defendant's representatives would descend on the area and prowl through the neighborhood to find houses with window stickers or lawn signs corroborating sales executed by Plaintiff. These stickers or signs would indicate a newly

consummated Plaintiff sale and that the customer had entered into a contract with Plaintiff for the monitoring of their home.

After finding Plaintiff's customers, Defendant's representatives would approach Plaintiff's customers and state and/or publish false, malicious, defamatory and disparaging statements about Plaintiff and the services Plaintiff sold to its customers.

Alarmex's representatives also would distribute to Plaintiff's customers and others in the neighborhoods and areas where Plaintiff's sales representatives were operating, fliers that included false, malicious, defamatory and disparaging statements about Plaintiff and the services Plaintiff sold to its customers.

These statements, both in writing and oral, included, among other representations, statements that were intended to falsely convey the impression and conclusion that Plaintiff was in financial trouble and would not be able to provide the service promised. Further, customers of plaintiffs were induced to cancel Alarmex representing that many of Plaintiff's previous customers ceased their service because of the above stated problems. Defendants also represented that the security system Plaintiff sold was not reliable, that Plaintiff could not be trusted because the company was not based in Puerto Rico, omitting that the company had persons available in Puerto Rico.

At the time that the statements were stated/published, Alarmex and its representatives knew, or should have known, that the statements were false, and yet they made the statements with malicious intent and for the sole purpose of enriching Defendant at Plaintiff's expense causing plaintiff's contract with signed clients to be cancelled and causing severe damage to Plaintiff.

Defendant's scheme to interfere with Plaintiff's contracts was aimed at not only inducing Plaintiff's customers to cancel their contract with Plaintiff, but also, causing that the clients instead enter into contracts with Defendant.

Plaintiff warned Defendant through a cease and desist letter that Defendant's campaign of poaching Plaintiff's customers by defaming Plaintiff to induce Plaintiff's customers to breach their contracts with Plaintiff was highly improper and should cease immediately.

Despite receiving Plaintiff's cease and desist demands, Defendant and its representatives refused to cease their improper actions and instead persisted and continued their campaign and scheme to poach Plaintiff's customers, defame Plaintiff, and wrongfully interfere with Plaintiff's contractual relations with its customers, all to the detriment and financial damage of Plaintiff.

Plaintiff lost in excess of 100 fixed term contracts per year during 2006 and 2007, as evidenced by the testimony that APX lost almost 100 contracts in four months in 2006 which was given by an officer of Defendant who was in charge of Defendant's poaching and smear campaign targeting APX. The contracts used in Puerto Rico during 2006 provided for a fixed term of 36 months and the contracts used in Puerto Rico during 2007 provided for a fixed term of 60 months. The contracts for both years had an automatic renewal clause (year to year) unless cancelled by one of the parties. The number of contracts lost during 2007 is conservative as the contract cancellations during that year were twice as high as those of 2006 despite the fact that the total number of contracts executed by Plaintiff during both years was very similar.

Plaintiff suffered the following damages because of Defendant's conduct described herein above:

    a.  2006
        i. Customers lost due to Defendant's contractual
          tortious conduct:                               100

        ii.    Average recurring monthly revenue:       $41.62
        iii.   Average multiple paid for Plaintiff's contracts:   34.3
        iv.   100 x $41.62 x 34.3 =
            $142,756.60
    b.  2007
        i. Customers lost due to Defendant's contractual
          tortious conduct:                               100

        ii.    Average recurring monthly revenue:       $41.39
        iii.   Average multiple paid for Plaintiff's contracts:   38.0
        iv.   100 x $41.39 x 38.0 =
            $157,282.00

The explanation of the terms used to calculate damages in the foregoing conclusions of fact is quite simple. The average recurring monthly revenue (RMR) is the average service fee expected every month from customers under the alarm contracts (including the contracts executed with Puerto Rico customers) sold by Plaintiff to third parties each year. Such contracts are occasionally pooled by Plaintiff to be sold to third parties much like commercial paper. Plaintiff often sells the alarm contracts to third party purchasers and other alarm monitoring companies. The RMR for only those contracts executed in Puerto Rico is higher than the one used by Plaintiff in its calculation. Thus, the RMR used in the calculation is a conservative number.

The average multiple is the number negotiated with those third parties who purchased alarm contracts from Plaintiff during the relevant time periods. The average multiple is a conservative number as the contracts actually had a longer duration during 2006 and 2007, to wit, between 36 and 60 months, respectively. The RMR, the multiple

and the number of contracts lost are multiplied to arrive at a total value for the contracts lost by Plaintiff, which is a conservative figure.

The total damages to Plaintiff as a result of Defendant's tortious conduct and defamation are valued at $300,038.60.

### A. CONCLUSIONS OF LAW

Given the foregoing conclusions of fact, the following are this Court's conclusions of law:

This court has diversity federal jurisdiction pursuant to 28 U.S.C.A. 1332, Diaz-Rodriguez v. Pep Boys Corp., 410 F.3d 56, 59-61 (1st Cir. 2009) (a corporation with its principal place of business in Utah, plaintiff, and a defendant with its principal place of business in Puerto Rico). The court concludes that the "nerve center" of plaintiff is the state of Utah pursuant to undisputed testimony and that of defendant is in Puerto Rico.

In order to prevail in a defamation action when the claimant is not a public figure[1], such as Plaintiff, it is necessary to prove that Defendant negligently published false and defamatory information which was the proximate cause of the damages suffered by Plaintiff. See *Colón v. Televicentro*, 2009 TSPR 43; *Krans v. Santarrosa*, 2007 TSPR 219. Defamation means the act of discrediting a person by stating information injurious to the reputation of such person. Id. Corporations have standing to bring a defamation action. See MVM Inc. v. Marcial, 568 F. Supp 2d 158 (D.C.P.R. 2008).

---

[1] Neither plaintiff nor defendants are public figures; both are private corporations engaged in the business of selling alarm systems to the public in general.

In A.M. Capen's Co. v. Am. Trading & Prod. Corp., 200 F. Supp. 2d 34, 48 (D.C.P.R. 2002). The court stated that the "Supreme Court of Puerto Rico recognized for the first time *in* General Office Products v. A.M. Capen's Sons, 15 P.R. Offic. Trans. 727 (1984), the possibility of a cause of action for tortious [contractual] interference, pursuant to Puerto Rico's general tort statute, i.e., article 1802 of the Civil Code. 31 P.R. STAT. ANN. § 5141. However, in order to establish such an action, a party must show:

>1) the existence of a contract;
>
>2) that the defendant who interfered had prior knowledge of said contract;
>
>3) that plaintiff has suffered damages; and
>
>4) a casual relationship between defendant's (interfering) acts and the damages suffered by plaintiff (causation)."

The Supreme Court of Puerto Rico has reaffirmed the holding of General Office Products v. Capens, Id. as to tortious contractual interference in Jusino v. Walgreens, 155 DPR 560, 575-576 (2001)[2] and Dolphin Int'l of PR v. Ryder Truck Lines, 127 DPR 869 (1991); 121 JTS 13, 1991 W.L. 735928 (P.R.); P.R. Off. Trans.

The damages suffered by Plaintiff as a consequence of the defamation and tortious interference committed by Defendant may be readily calculated based on the number of contracts lost by Plaintiff because of such conduct as established by the undisputed testimony of Defendant's vice president who supervised and directed Defendant's tortious contractual interference conduct. See e.g. Continental Casualty Co. v. Southwestern Bell Telephone Co., 860 F.2d 970 (10th Cir. 1988).

---

[2] In a separate order the court provides the official translation available of only the tortious contractual interference doctrine section of the Jusino v. Walgreens, Id., the only section translated by the Supreme Court up to this writing. The court has requested the entire translation of the Walgreens Id. case to be filed by the court at a later date.

The Court further finds that Defendant was obstinate in opposing Plaintiff's claims. Defendant ultimately conceded said claims by abandoning the litigation causing eventual default. Moreover, the testimony of Defendant's vice president clearly proves that Defendant engaged in a deliberate scheme and course of conduct to defame and disparage APX, its products and services, and to interfere with Plaintiff's customer contracts. Plaintiff has submitted a request for lawyers fees in excess of $149,000.00 based on a lodestar calculation.

However, because the instant case is based on diversity jurisdiction, the court must apply lawyers fees based on Puerto Rican law. Newell Puerto Rico, Ltd. V. Rubbermaid Inc., 20 F.3d 15 (1st Cir. 1994) (requiring application of Puerto Rican Law as to lawyers' fees in diversity jurisdiction); De León López v. Corporación Insular de Seguros, 108 F.3d 425 (1st Cir. 1992). (The standard is "unreasonbly adamant or stubbornly litigious, beyond the acceptable demands of the litigation, thereby wasting time and causing the court and others litigants expense and delay.") Mejias Quiros v. Maxxan Property Corp., 108 F.3d 425,429 (1st Cir. 1997) (citing De León, Id.). Undoubtedly defendant has displayed "temerity" or obstinacy and hence fees are authorized pursuant to Commonwealth Rule 44.1(d), P.R. Laws Ann. Tit. 32 App. III R. 44.1. Notwithstanding lawyers' fees under Puerto Rican Law are not designed in all cases of obstinacy to the totally of compensation for all fees actually paid. See Rule 44.1, P.R. Laws Ann. Tit. 32 App. III R. 44.1; Soto v. Caribe Shipping, Inc., 141 D.P.R. 726 (1996) (the court retaining discretion).

The court, after reviewing plaintiff's claim for around $149,000.00 deems that the claim would have been close to approval under the federal lodestar method, however,

under Puerto Rican Law the claim is to be reduced to $100,000.00 for the two consolidated cases considering principally that the last legal matters were uncontroverted and on default all occurring after the lawyer of Alarmex resigned.

For the same reason of obstinacy, the Court awards interest under Puerto Rico Rule 44.3 since the filing of the complaint, August 8, 2006, until the date of payment of the judgment. The applicable interest rate under Puerto Rican law varies pursuant to the periodic revised rate established under the law by the Board of the Office of the Commissioner of Financial Institutions, P.R. Laws Ann. Tit. 32 App. III R. 44.1. Currently the rate is 4.25%.

In sum, Plaintiff is granted the sum of $300,038.60 for damages suffered plus costs[3]; attorney's fees in the amount of $100,000.00; and   prejudgment and post judgment interest on this Judgment at the rate of 4.25% until full payment is made or whatever rate is periodically set forth by the Board of the Office of the Commissioner of Financial Institutions.

Interest will henceforth accrue at the periodic rate established under Puerto Rican Law by the legal interest rating authority. P.R. Laws Ann. Tit. 32 App. III R. 44.3 (The Board of the Office of the Commissioner of Financial Institutions).

JUDGMENT SHALL BE ENTERED ACCORDINGLY.

In San Juan, Puerto Rico, this 28th day of September  2009.

> s/Daniel R. Domínguez
> DANIEL R. DOMINGUEZ
> U.S. DISTRICT JUDGE

---

[3] Costs must be separately requested. The court shall then proceed to tax the costs.